Turning to the next case which is United States of America v. Rajesh Maddiwar. I will call on attorney for appellant. Good morning this is Kevin Keating. I represent the appellant. I have struggled with trying to come up with the right word or phrase to describe this unusual case. I've thought of thin, I've thought of a close case, a marginal case, certainly circumstantial. In fact the trial court remarked during the trial itself, this is a quote, I didn't quite know just how circumstantial this case was going to be. And the government cited the case as being a circumstantial one in trying to get certain evidentiary rulings from the trial court which are now the subject of this appeal. Yet the government now argues that if there were errors associated with those rulings it doesn't matter. They're harmless because the case was overwhelming which it certainly was not. It wasn't overwhelming because the evidence fell well short of establishing a conspiracy, the only charge in the indictment. Conspiracy charges are notoriously complex, perhaps needlessly so, but the fundamental tenet of a conspiracy is that there must be a mutual understanding. There are no unilateral conspiracies. And here the lone cooperator called by the government offered the testimony that they consciously hid facts from Mr. Manowar, hid the fraud elements of this case from Mr. Manowar. They viewed him as an honest and reputable attorney who would not have done, this is a quote, a single closing had he known the truth. He offered these representations in both direct and in cross-examination that he kept the truth from Manowar in order to keep him from doing closings. It is literally impossible for there to have been a conspiracy when the lone cooperator has testified he did not have a mutual understanding with Mr. Manowar. The conspiracy Counsel, this is Judge Raggi. Don't we have to assume on this appeal that the jury did not believe those disavows by Mr. Alvaranga? Now, I understand that if they didn't, that leaves them with no evidence from him. But from the totality of the other evidence, as you say, circumstantial, I am not sure that your sufficiency argument persuades. But let's start with the principle. Don't we have to assume the jury didn't credit Mr. Alvaranga? I don't believe so, Your Honor. We have to view the facts in the light most favorable to the jury's verdict. And that would suggest that when he said he didn't say these things, they didn't believe him. Well, perhaps. But I think the more reasonable conclusion is that the jury didn't have a proper understanding that a conspiracy is a mutual agreement by necessity. How could they possibly not believe the government? Now, I'm a defense lawyer, so I'm certainly not saying believe all government witnesses. But the government itself didn't argue at trial that Mr. Alvaranga is not to be believed. That was not their position in the case. Alvaranga was crystal clear in his testimony. We didn't tell him these things. And I think, Your Honor, it has to be viewed in the context of what the real role of an attorney is who's representing a seller at a short sale closing, where the seller has already, and this is an everyday commonplace occurrence, already negotiated with a short sale company. This seller, the deal is already struck. The seller is getting out of their debt. The bank has set the price through the bank's appraisal. The closing in these matters, frankly, is a simple matter for the seller, the attorney representing the seller. The seller is conveying title and they walk away from their debt. So the misrepresentations that is the subject of this case were easily concealed from Mr. Mattawar months before these closings would take place, oftentimes months. This is why we have argued in our brief, Your Honor, the government fought so hard to get certain evidentiary rulings from the court. And I want to begin with the court's ruling, which allowed an earlier interviews he had with Mr. Mattawar. Mattawar was not a target. Mattawar was never charged. There was no, none evidence of wrongdoing. The government argued that this should be allowed in their direct case under the notion, there's no citation in law for this, generalized notice of real estate fraud. Absence of mistake, counsel. Absence of mistake about real estate fraud was what they claimed. Because he claimed he had no idea. Mr. Mattawar's defense, yes, but those earlier matters, Your Honor, that he was interviewed on had nothing to do with short sale transactions. They were disconnected from the participants in this case. They're utterly unrelated. And the court allowed them in on two bases, 404B. I think that ruling was clearly erroneous because there was no evidence of wrongdoing by Mattawar. The Huddleston case, of course, states that there must be. And under 801 is the non hearsay admission by a party. But under 403, Your Honor, that testimony was prohibitive of nothing, nothing, and enormously prejudicial because the government then drove a truck through the court's ruling. Generalized notice. Then the government got up in their opening statement and said, this is virtually a quote, ladies and gentlemen, by the time he joined, he being the defendant, the scam, he had been interviewed by the FBI, not once, but twice. You see, he had been, quote, the block. They then cross-examined a character witness. Asking the character witness, were you aware that he had participated as a closing attorney in prior fraudulent transactions? Aware he had been interviewed by the FBI in 2010 and 11? Have you ever been interviewed by the FBI? They asked the agent, who made the decision not to prosecute him? Was it you? The clear inference being the agent would have prosecuted him. The real reason that they wanted this testimony was to try to dirty up Mr. Mattawar because they knew they were short. They had a cooperator who said, we hid it from him. And then they drove a truck through the court's ruling and improperly elicited this testimony. They leaned on it heavily and repeatedly. I also argue that the Mitch Cohen article, I respectfully submit that that article is unadorned here. But it was Mitch Mattawar, counsel, this is Judge Kula, it was Mr. Mattawar himself who mentioned Mitch Cohen in an email. Isn't that correct? Correct. Mr. Mattawar sent an email to the cooperator because Mattawar had received a call from a lawyer who said he wanted a contract canceled. I'm paraphrasing, but the contract shouldn't have been signed. And Mattawar is writing that he mentioned, he mentioned Mitch Cohen, dot, dot, dot, need I say more? That's it. That allowed, according to the court, the government in their direct case, in the direct case, to introduce what's clearly, it's not hearsay, a newspaper article referencing the arrest of Mitch Cohen, which had nothing to do with Mr. Mattawar. There was no evidence Mattawar knew this Mitch Cohen. There was no evidence that that email was about this Mitch Cohen. The judge gave a charge to that effect. In fact, the charge was rejected by defense counsel. Right. But it was, so it was prepared to cure that problem that you're identifying. Let me ask you this. My concern is how, how would a court properly allow a jury to know something? I mean, if someone said, if someone charged with poison said, look, it's a Lucretia Borgia, need I say more? Or someone charged with an axe murder says, look, it's a Lizzie Borden, need I say more? How would the court properly instruct a jury on that? Or how would the evidence permissibly allow a jury to know what the person was referring to? Well, I think your honor, if it was a name or a reference to something which is widely known, it speaks for itself. Well, now we are in the situation about whether the court abused its This was a Newsday story about charges that had been filed. And I gather you don't disagree that Mr. Cohen was charged with this kind of crime. And so I'm not sure that I see what the harm was here, where you rejected a charge that would have cured the error that you articulated for us. And meanwhile, there's no dispute that Mr. Cohen was indeed charged with these kind of crimes. I think what I didn't reject it, your honor, I was not trial counsel. No, no, I'm sorry. I you understand what I mean. Council of record at the time did. Yes. Well, trial counsel routinely reject charges, your honor, for strategic reasons, because sometimes it only serves to highlight the evidence. I understand that. But you also take the consequences when you want to argue that you were prejudiced by in the way that the court would have tried to cure. But we're not arguing here, your honor, that a charge should or should not have been given. We're arguing here that the evidentiary ruling at the threshold was erroneous, because that newspaper article, I give the repeat, it's under Doran's hearsay, it only goes to this. But why isn't it something the court can take judicial notice of based on on a news report that's done all the time in security cases with respect to the state of market? So, as I said, there's a news report and reporting what is not disputed that there were charges filed. Right. But here it goes. The basis for admitting it was to go to the state of mind of Mattawa. It still doesn't alleviate the hearsay element, your honor. Can I just ask this? Would you agree that if the statement from Mr. Mattawa had been Mitch Cohen, comma, as we all know, need we say more or Mitch Cohen, as everyone's talking about, need we say more? Isn't it fair to say that the here's the article was submitted to prove that this was a fact that was widely known, whether true or not, but had been widely reported because it was in the newspaper, and that knowledge of this, at least allegation was widely diffused, whether true or not. Maybe Newsday lied. Maybe there's never been a Mitch Cohen. Maybe there's never been a Mitch Cohen who was charged, but it was widely reported in the media. And therefore, the inference the jury was asked to make, which the jury could make or not, is it was widely known in the media and therefore would have been known to Mr. Mattawa that people were talking about Mitch Cohen. Maybe who knows? Maybe he's a character in a movie. But as long as there's an article about it, then the inference is it was widely reported, and then he would know who the person is that we're all talking about. Mr. Mattawa testified that he did not read the article. Mattawa testified that he did not know this Mitch Cohen that was referred to, did not read the article, had no interaction with this Mitch Cohen yet. Excuse me, but didn't he admit, didn't he admit at sentencing that he did? I think there was a reference to that, Your Honor. Right. I mean, so I think it's hard, you're hard pressed to urge that he be credited with something that he later disavowed. But Your Honor, whether he admitted it at sentencing or not, which is not a fact clear in my head at the moment, to be candid, whether he did or did not doesn't address, of course, the damage that was done by the admissibility of a hearsay article. But wasn't the jury entitled to disbelieve his testimony when he says he didn't read the article? Or who cares? Again, the inference need not be that he read that particular article. He's the one who makes the reference to Mitch Cohen, need we say more? So the jury was clearly based on the email entitled to infer that Mitch Cohen is a person known to Mr. Mattawar and known in the context of being a cautionary tale in the context of mortgage closings. I respectfully don't agree, Your Honor. When the defendant writes in an email that he mentioned A, he mentioned B, he mentioned Mitch Cohen, he writes dot, dot, dot, need I say more? It could equally be a reference to the fact that how much should I write in this email? What else do you want to know about this phone call? And there's no- What sounds more actually something that ties exactly into the government's theory of the case is that the reason why the co-conspirators didn't speak more openly about this is because they wanted to minimize the communications about it. So it sort of gives them all plausible deniability. Oh, well, we never talked about that. Oh, I never told Mr. Mattawar that this would be, you know, crime. I mean, that sort of seems to me to be the theory of the case here is that, you know, it's all nod, nod, wink, wink, but we all know what's going on. And then they could disbelieve Mr. Alvingar or they could take his disavowals of having explained everything in excruciating detail to Mr. Mattawar on the theory that, well, you know, it takes away his plausible deniability. But Your Honor, that wasn't the testimony of the co-operative. It wasn't to minimize conversation. The government asked the specific question, why didn't you talk about it? And oftentimes- That's right, because he said then he wouldn't have done it. But that could have been not because had he known the truth, he wouldn't have done it. But had you made it more specific, had you sort of put it all on the table, then he couldn't have plausibly claimed to the disciplinary committee later, oh, well, they never told me. What I'm saying is that is a permissible inference the jury could have drawn, right? Not the one that you're asking them to draw. I respectfully disagree. Not when the same co-operator says he viewed Mattawar as an honest and reputable attorney who would not have done a single closing if he knew the truth. This wasn't about trying to hide the facts. Let's not openly talk about what we know we're doing here. This was they wanted to keep him doing closings. And had he known the truth, he would not have participated. That was the testimony of the co-operator. The final errors, we believe, occurred in the court affirming certain baseless hearsay objections during the defense case. The defense called one of the, quote, homeowner victims, a Miss Warner. The trial court precluded Miss Warner from testifying on direct examination to the conversations and advice given by Mattawar at the closing. The central argument of the victim homeowner essentially was that Mattawar didn't do anything, showed up, played no real role, was on his cell phone. That was the opposite. Two title closers were called by the defense to testify that Mattawar did his job at the closing. And when the defense sought to elicit from one of the, quote, homeowner victims who received that Mattawar was paid for attending the closing, what advice did Mattawar give you? The court precluded that as hearsay. It wasn't hearsay, respectfully. It went to the good faith role that Mattawar was playing as attorney at the proceeding, whether the advice was accurate or not was not the point. Thus, it isn't hearsay. It was germane. It went to the very heart of the case. Mattawar himself was precluded from offering certain testimony on hearsay grounds, which we think was significant errors. He was precluded from offering testimony about a call he made to the cooperator when he learned his name was on contracts. He was precluded from offering testimony as to another call he made to the cooperator when he had received a call from a state assemblyman complaining. He was precluded from offering testimony about how he, Mattawar, called other attorneys upon learning of what was going on here to tell them to avoid these individuals. None of them were offered for the truth. All of it went to the heart of the case. And the court's affirmance of the baseless hearsay objections were an error. Counsel, your time has long since expired, but you have reserved one minute for rebuttal. We'll hear from the government. Yes, may it please the court. My name is Jessica Greenwood, and I'm an assistant U.S. attorney for the Southern District of New York. I represent the United States on appeal, and I also represented the United States in the proceedings below. With respect to the arguments that counsel raised first with respect to sufficiency of the evidence, I think your honors are exactly correct with respect to sufficiency of the conspiracy count, that the issue here is the significance of particular testimony by Mr. Alvarenga that the jury was free in its judgment of his credibility to accept or reject, and specifically in responding to counsel's statement that the government never suggested that Mr. Alvarenga's testimony was anything but entirely truthful and should be entirely relied upon. I'd point the court to summation in the transcripts at 1311, in which the government was very candid about the significance of Mr. Alvarenga's testimony, that his testimony was at times internally inconsistent, and that the jury was free to weigh his testimony and accept or reject, as they were instructed by Judge Ramos, any portion of that testimony that they deemed in their role as the credibility finder to be acceptable or not. Moreover, even interpreting the testimony by Mr. Alvarenga in the way that Mr. Mattawar suggests, it's not fatal to the conspiracy charge, as he would claim. To be clear, the crime that was alleged here is not a two-member conspiracy involving only Mattawar and only Alvarenga as the participant. There were numerous co-conspirators, including the owners of Hasni, Berthelmeyeri, and his son Amirmeyeri, with whom Mr. Mattawar had a longstanding business relationship, and there was testimony at trial with respect to not only their role in the conspiracy, but their dealings with Mr. Mattawar. As such, even assuming that the evidence could be interpreted as reading there being no meeting of the minds between Mattawar and Alvarenga, there was still evidence of a conspiracy generally, and the only assumed dispute was the defendant's membership in that conspiracy. The government presented strong, albeit circumstantial proof, that the defendant intentionally joined in that conspiracy with one or more of the Alvarenga, and did so with actual knowledge or conscious avoidance of the fact that they were engaging in wire fraud and bank fraud. And again, to the extent that the cited portions of Mr. Alvarenga's testimony were not consistent with his other testimony at trial, the jury was free to resolve those inconsistencies by accepting or rejecting any part of it. Can I ask you about the Newsday article? Yes, Your Honor. Did you ever link up affirmatively that Mr. Mattawar had ever read that or any other articles about Mr. Mitchell? No, Your Honor. So what do you think? You really just were asking sort of the general inference that, oh, he probably must have read that or some similar article? That's the inference, right? You need, otherwise it's not relevant, right? That's correct. And I think the inference, Your Honor, was fairly drawn and it was a fair determination by the district court in terms of the conditional relevancy of the argument based on the context of Mr. Mattawar's reference to Mitch Cohen himself. The response, the email that was generated by Mr. Mattawar referencing Mitch Cohen was generated in response to a call in which an attorney for a HAZME victim told Mr. Mattawar that a contract needed to be canceled because it did not reflect what the client wanted. And as Patricia Levy, the daughter of that victim who was present for the phone call on the attorney's side, not Mr. Mattawar's side, but the attorney's side recalls, he gave him the attorney... Hello, this is Judge Raggi. I've lost sound. Yeah, me too. Maria, could you try and... Judge, I do not see the attorney on the line. She got disconnected. I have instructed everybody to call us right back if this were to happen. It's actually the first time that this happened. Thank you. Judges, this is Thomas McKay. I'm co-counsel for Ms. Greenwood on this case. I think perhaps if your honors would give her a moment to try to get reconnected, but if all else fails, I'm happy to continue in her stead if necessary. Hi, your honors. Apologies, my phone said call failure in big letters, which is never a good sign. Thank you. So to finish the response to your question, your honor, the context for Mr. Mattawar's reference to Mitch Cohen, again, was a call in which he was told that a contract needed to be canceled and was specifically told, according to Patricia Levy, that he didn't want to lose his law license over this situation. And in response to receiving that admonition, sent an email to his Hasme co-conspirator saying, I was given a lecture by the attorney for Winston Levy. He gave me the example of Mitch Cohen. Need I say more? Why do you get to prove who Mitch Cohen is through a Newsday article? If your argument is not or your proof is not that the defendant saw that Newsday article, why is that article admissible? The article itself had enough indicia that based on the closeness in time of the article, the proximity of the allegations, the nature of the allegations against Mr. Cohen, that there was enough indication for Judge Ramos to conclude that whether Mr. Mattawar read this article or another article, that there was reporting so that it was a fair inference to say that when Mr. Mattawar referred to Mitch Cohen, he was referring to this Mitch Cohen and this report or either substantially similar report about his conduct. And it was fair to allow the jury to understand that when he affirmatively gave the example of Mitch Cohen in his own email and indicated his own understanding of sort of what the implication was of being compared to Mitch Cohen, the jury be allowed to get the reporting, which was not offered for its truth because as the court noted with respect to the appellant's argument, it didn't matter whether or not Mr. Cohen had ever in fact been arrested or had ever committed the underlying... My concern with that is if it didn't matter whether he was ever arrested, then it does matter whether Mr. Mattawar saw the article. If instead your point is, well, who is Mitch Cohen? In terms of relevancy to this case, I would have thought the proper evidence for that would have been the court records of his having been arrested because then you do care about the truth. But if you don't care about the truth of it, isn't it more important that you be able to show that he saw that article, that the defendant saw that article? I think that the point here, Your Honor, is that there were enough facts made known and sort of as part of the government's motion eliminates to argue the conditional relevance of the article based on the fact that it seemed clear from Mr. Mattawar's statement that he was either aware of these allegations or other similar allegations against Mitch Cohen and that he was mindful of the allegations when he was arrested. The problem with this, though, isn't it that in every case, defendants talk about things, right? And I don't think I've ever seen a case where a newspaper article was put in to prove what people were talking about without any effort to actually link it up to the defendant having read the article. I mean, otherwise, my gosh, you just get out your LexisNexis database and just start putting it in a circle to explain every term, every phrase, everything that people say. And you say, well, look, it was in the newspaper. Therefore, it was well-supported. Therefore, it's a fair inference to say that you knew what the newspaper article was talking about. I mean, that's a kind of a limitless inference that you might allow. As long as it was in the newspaper, it's assumed to be widely known. And that's dangerous. I don't think that the ruling here in this context, again, was sort of limitless for the ways that you described, because as was noted in the government motion to the court, there were indicia here to indicate that this particular article was not only reported in close proximity in time, concerning the same geographic location, the same industry. There wasn't a risk of sort of a broad polling of any publicly available facts, but a specific fact in specific industry that was when Mr. Mattaworth himself indicates that he has an understanding of the widespread allegations about Mr. Cohen. So in a Latin King murder, can you introduce, I'm sorry. No, I mean, how could that, how could the article show that he was aware if he said he never read the article? How could it prove that he was aware of the widespread allegations against Mitchell Cohen? I would say, Your Honor, it's the combination of the article and his response to being compared to Mitch Cohen by Mr. Levy. There was no, you know, contrary to how Mr. Mattaworth characterized it when he testified on direct, there was nothing in his email response that indicated he didn't have an understanding of who Mitch Cohen was and what the allegations were against him. In fact, when he's told you're going to lose your law license if you engage in this type of transaction, and he is given the example of Mitch Cohen, he doesn't respond to his co-conspirators to say, who is Mitch Cohen? What is he alleged of that I'm being compared to? Instead, he says, I was given a lecture and the example of Mitch Cohen, dot, dot, dot, need I say more? So I think his statements combined with sort of the circumstantial closeness, again, in time, proximity, and subject matter of the article together allowed Judge Ramos in his discretion to find that the article was conditionally relevant for the non-hearsay purpose of the government's offers. Judge Pooler, I know the government's time is running out, but I have some questions about some of the other evidentiary rulings. May I ask them? Of course. Thank you. Ms. Greenwood, with respect to the FBI interviews, do I understand you correctly to have argued that these were admissible to show that the is that the grounds for their admissibility? I would say that part of the grounds for the admissibility, Your Honor, certainly being put on notice of the need to be aware of where... What's the other purpose? What's the other purpose for which it's being offered? The lack of mistakes with respect to the current transaction and... Because he was put on notice, right? Yes. Not simply that he was put on notice, Your Honor, but also the affirmative statements that he made to the FBI in the course of the interview, suggesting, for example, when he told the FBI, here, I couldn't have known about fraud because you can only learn about that kind of thing after the fact, and a client wouldn't have any reason to contact me after a closing, essentially, unless there was fraud to report. Here, in this instance, having made those statements to the FBI, we have examples of numerous clients contacting the defendant after the closing and saying, hey, there are issues here. There are red flags. There are issues with the business practices that have to be engaging at these closings, and I have concerns, not only directly from the victims, but their lawyers, the state assemblyman's office, and despite having gotten notice after about the illegal practices that had me, the defendant said, oh, I'm still unable to know that there was a fraud here. I was duped. This was a mistake. This was a total accident that I got involved in this. That's not my question, Ms. Greenwood, so just try and focus on the question because you are over your time. I reviewed the transcript, and I didn't see where the agent ever testified that he told Mr. Madawan that such conduct was fraudulent. He testified conclusorily that that was his purpose, but he didn't ever testify that this was what he told Mr. Madawan. Did I miss something? The questions that he was asking him specifically, about the underlying mortgage fraud transaction, if I understand your question, I think he was asking him specifically about fraudulent practices, like the use of show checks and misrepresentations about the fraud. I don't recall there being a specific- Your argument is that this testimony was admissible to show that he had been put on that such conduct was fraudulent. I was looking in the recounting of the testimony for something that indicated the agent put him on notice that it was fraudulent to do A, B, and C, and I didn't see that. Did I miss something? I think, Your Honor, again, the questions that were posed at him in which he was asked in terms of that particular fraudulent transaction, I think that was the nature of Agent Bailey's testimony. It didn't put him on notice that it was a fraud. You're saying that it was his acknowledgment that he knew it was fraudulent? Is that what the argument now is? I think, Your Honor, again, the acknowledgment by him that he would be able to learn of a fraud if he was contacted after the fact is sort of one of the relevant points there in terms of his notice and lack of mistake in the forensic team. All right. Now I want to ask you about testimony that was not allowed on B, the defense was not allowed to elicit. With respect to the Carmen Warner questions, as I understand it, she was not allowed to answer about what the defendant had not told her, and I'm not sure how eliciting that he never said certain things would raise a hearsay objection. What's the government's position on that? I think with respect to the absence of a statement, it may be that that particular objection or that there may not have been, you know, the absence of a statement may not have been a hearsay. So that should have been allowed, right? Well, I think there were certainly other grounds to disallow it. With respect to this particular individual, she was not a situated in the way that the other housing victims were in terms of this is an argument that doesn't go to admissibility. I mean, you are doing it's irrelevant. I shouldn't have been admitted on relevancy grounds. I mean, the part of the government's case was what he had told or insinuated to others. And now this was a witness who, even if in a different context, was able to say that that was not what she had told her. Her, obviously, the Warner situation is a little bit more... I'm just asking about admissibility. Is it your position that that was inadmissible to have her answer that question? Again, to the extent that it was simply attempting to show the absence of a statement, which was not relevant to her situation, in which she said she's not even the owner. So eliciting the fact that you did not tell someone who on her own testimony on cross said she wasn't the owner of the property to then elicit from them that they were not made, not made any misrepresentations about failure of ownership. But to be clear, Your Honor, this witness was able to testify extensively about how the closing happened, about all of the explanations that Mr. Mattawar did give her in the course of that closing. And Mr. Mattawar was likewise, when he testified, able to fully explain not only the circumstances of this closing, but each and every closing that was described by the individual housing witnesses at trial. So even if there was some error in denying these isolated hearsay objections, the defendant has not shown any additional testimony that he would have been able to elicit or how that testimony would have substantially altered the jury's... the facts before the jury, such that any error here would be harmless. Let me ask my last question. The defendant himself was precluded from testifying about what he told co-defendants at particular times. Is that correct? I think that's correct. Have I understood? I'm not asking you yet to explain, Ms. Greenwood. Is that correct? He wasn't allowed to testify about what he told co-defendants at particular times. You objected and the court sustained it. There were sustained objections, yes, with respect to questions about statements that he made through my online desk. All right. Now, I need to understand why that was not admissible. I mean, I gather that you're arguing that it was hearsay, but was it offered for the truth or just the fact of what was said? My understanding was that he was saying that he wanted to say something based on something Alvarongo told him. Regardless of the truth of what Alvarongo told him, it explained his state of mind was his argument. This is the defendant not being allowed to put on evidence, and I need to understand why not. With respect to these particular questions, Your Honor, again, even if there was some error in those particular questions, the defendant was allowed throughout his direct and cross-examination to offer his version of events and discuss exactly— We'll get to whether it was harmless. I need to understand whether it was a correct ruling by the district court. Then we'll deal with whether it was harmless or not. Are you saying this was a correct ruling to prevent the defendant from answering that question? I think, again, Your Honor, with respect to these particular questions about about his statements, that they were offered for either the truth or to show inconsistent or prior good acts of the defendant, but that any other error, as you say, will reach sort of that question, but that any error was harmless. His argument, as I understand it, is regardless of whether what Alvarongo told him was true, he was saying something to others based on what Alvarongo told him. Did I misunderstand that? I think there's not a detailed explanation by the defendant in his appellate argument of what would have been the additional evidence that he would have offered here. Certainly, there were isolated hearsay objections that were sustained, but we do not have a proper from him with regard to what— Assuming that we were to find that he should have been allowed to answer those questions, that there was no proper objection to them, what's your argument for why it was harmless? The defendant was allowed both on direct examination and in response to cross-examination questions to testify exhaustively with respect to all of the topics here. The particular questions that even if there may have been some additional information to elicit would have simply been cumulative of the other arguments. In particular, Your Honor, with respect to statements he claims have made either to Alvarongo or to others, in particular, at the end of his participation in the conspiracy, there was extensive testimony at trial about his attempts to withdraw, about the complaints that he made to Mario Alvarongo and to Hercule Miri and Amir Miri about saying, don't use my name on these contracts. I want to be removed from this. His attorney characterized it as once he learned about this hotbed of fraud happening and having people— everyone that he claimed that he wanted to withdraw. So, the testimony that was being elicited through these isolated objections that were sustained was offered elsewhere. And again, the defendant wasn't offered any sort of additional evidence that would have been admitted, that there wasn't discussed at trial or how it would have influenced the jury's verdict, given the extensive testimony about his noisy withdrawal, his repeated denials about how the own versions of events, about the fulsome explanations that he gave to the Hathi clients and about his attempts to withdraw once he claims Alvarongo's fraud. Thank you, Judge Pooler. That's all my questions. Thank you, Judge Brashy. I have one more question of the government. You argue that the admission of the Newsday article was nevertheless harmless. Is that correct? Yes. Certainly, it was a strong piece of circumstantial evidence, but to characterize it as the defendant would, as the only uniquely damning piece of evidence, to the extent that it shows criminal liability, is a significant overstatement. And I think here it's important to note— That's only half of my question. What other evidence, if anything, was introduced to facilitate the jury's understanding of what Matt Awa was referring to when he mentioned Mitchell Cohen? Any other evidence besides the Newsday article? Other than the evidence— How could it be harmless? Well, two points that I would raise there, Your Honor. First, the overall conversation that led to his reference to Mitch Cohen, again, in which the attorney told him that the contract that had been signed was Woodson-Levy's name, was subject to being canceled, that there were issues with that transaction, and that he didn't want to lose his law license over this issue, and having been compared to Mitch Cohen. And then his response to the co-conspirators citing Mitch Cohen was the totality of the Mitch Cohen-related evidence at trial. But with respect to— I think the error question is not so limited as to looking at just what the evidence of Mitch Cohen was, but the broader question of what evidence there was that the defendant knowingly and intentionally was engaged in a criminal conspiracy. And there, the other evidence at trial, there was significant other evidence at trial, even though a circumstantial case can certainly still be a strong one. And so, as one example, Your Honor, there were contemporaneous emails that the defendant sent his co-conspirators after being notified of similar closings where there were complaints, and how they were being handled, in which he messaged Alvarenga, saying, I'm shitting my pants here. What are we doing? Messages in which he, when being told that contracts needed to be canceled, called them love letters, and was sort of playing, making fun of the debtors, and sort of treating them cavalierly and lightly. There was testimony by Mario Alvarenga that when there were concerns at closings, and it looked like his clients weren't going to go through, he, instead of addressing those concerns with his clients, took Alvarenga to the side, and then ultimately, when the closing went through, would comment to Alvarenga about the great crisis that launch development was getting. So, there was plenty of other evidence that he viewed himself as a sort of a joint venture, and that he acted with the requisite criminal intent. So, I think that the harmless error analysis for the Mitch Cohen article has to be placed in that broader context. Thank you, counsel. That concludes your time. Let's hear from Mr. Keating for his one-minute rebuttal. Yes, since I only have a minute, I just want to address the sufficiency argument once again. The government now argues that if the evidence didn't establish a conspiracy with Alvarenga, the cooperator, and Madowar, well, in their words, to be sure there were other co-conspirators in the case. Our argument is sufficiency, however. So, to adopt the government's argument would be the following inference, that Alvarenga affirmatively states, we kept him in the dark. Alvarenga is a partner with the other co-conspirators. There's little, if any, evidence about the conduct and interaction between the co-conspirators and Madowar, my client, yet we can infer the existence of a conspiracy between Madowar and the others who didn't testify, about whom there's little evidence. And the reasonable conclusion, of course, would be that Alvarenga, the cooperator's position, keeping Madowar in the dark would be the position of his partners. So, from a sufficiency standpoint, simply arguing this other co-conspirators about which there's little, if any, evidence doesn't carry the day. Thank you, counsel. Thank you both. We'll reserve judgment. And that concludes the argument portion of our hearing today. I'll ask the clerk to adjourn court. Court stands adjourned.